**LITE DEPALMA GREENBERG, LLC**
Allyn Z. Lite
Mayra V. Tarantino
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
alite@litedepalma.com
mtarantino@litedepalma.com

**LITE DEPALMA GREENBERG, LLC**
Steven J. Greenfogel
1521 Locust Street
8th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 268-7641
sgreenfogel@litedepalma.com

*Attorneys for Plaintiff*
[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HI LINE SUPPLY CO., LTD., on behalf of itself and all others similarly situated, | Civil Action No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| vs. | |
| SIGMA CORPORATION, McWANE, INC. and STAR PIPE PRODUCTS, LTD., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff, HI Line Supply Co. Ltd. ("Plaintiff"), whose principal place of business is

located 405 East Lake Avenue, Peoria Illinois 61614 on behalf of itself and all others similarly

situated, brings this civil antitrust action against defendants Sigma Corporation ("Sigma"),

1

McWane, Inc. ("McWane") and Star Pipe Products, Ltd. ("Star Pipe") (collectively, "Defendants") under the antitrust laws of the United States alleging:

**NATURE OF ACTION**

1.      Plaintiff brings this class action against Defendants for violations of Sections 1 and 2 of the Sherman Act of 1890 (the "Sherman Act"), 15 U.S.C. §§ 1 and 2, concerning ductile iron pipe fittings ("DIPF").

2.      DIPF are components of pipeline systems that transport drinking water and waste water under pressurized conditions in municipal distribution systems and treatment plants. DIPF are used to join pipes, valves and hydrants in straight lines and to change, divide or direct the flow of water.

3.      Defendants and their co-conspirators engaged in an unlawful conspiracy to fix, raise, maintain and stabilize the price of DIPF sold throughout the United States beginning in January 2008 and continuing through January 2009.

4.      In February 2009, Congress passed the American Recovery and Reinvestment Act of 2009 ("ARRA").  ARRA allocated over $6 billion to water infrastructure projects, conditioned a requirement (the "Buy American Provision") that such projects use domestically produced materials, including DIPF.

5.      In February 2009, McWane possessed monopoly power as the sole supplier of a full line of domestically produced DIPF in most commonly used sizes.

6.      To maintain its monopoly over domestically produced DIPF, McWane engaged in various exclusionary practices, including conspiring with Sigma to keep potential competitors out of the domestic DIPF market.

7.      Plaintiff purchased DIPF directly from one or more of the Defendants during the Class Periods (defined below). As a direct and proximate result of the unlawful conduct and conspiracies of Defendants, Plaintiff and other members of the Classes (defined below) have paid more during the Class Periods for DIPF than they otherwise would have paid in a competitive market and have therefore been injured in their respective businesses and property.

## JURISDICTION AND VENUE

8.      Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act of 1914 (the "Clayton Act"), 15 U.S.C. §§ 15 and 26, to recover treble damages, obtain injunctive relief, and receive the costs of this suit, including reasonable attorneys' fees, for injuries sustained by Plaintiff and the Class as a result of Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

9.      This Court has jurisdiction over this action pursuant to Sections 1331 and 1337 of the United States Judicial Code, 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

10.     Venue is proper in this District pursuant to Sections 4(a), 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and Sections 1391(b) and (c) of the United States Judicial Code, 28 U.S.C. § 1391(b) and (c), because one or more of the Defendants reside, are licensed to do business, are doing business, transact business, are found or have agents in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

11.     Personal jurisdiction over each of the Defendants is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because each Defendant resides, is found, transacts business, or has an agent in this District.

## PARTIES

### PLAINTIFF

12.     Plaintiff HI Line Supply Co., Ltd. is an Illinois corporation with its principal place of business in Peoria, Illinois.  During each of the Class Periods, Plaintiff purchased DIPF directly from one or more Defendants.

### DEFENDANTS

13.     Defendant Sigma Corporation ("Sigma") is a New Jersey corporation with its principal place of business at 700 Goldman Drive, Cream Ridge, New Jersey 08154.  At all relevant times, Sigma has imported, marketed and sold DIPF throughout the United States.

14.     Defendant McWane, Inc. ("McWane") is a Delaware corporation with its principal place of business at 2900 Highway 280, Suite 300, Birmingham, Alabama 35223. At all relevant times, McWane has produced, imported, marketed and sold DIPF throughout the United States.

15.     Defendant Star Pipe Products, Ltd. ("Star Pipe") is a Texas limited partnership with its principal place of business located at 4018 Westhollow Parkway, Houston, Texas 77082.  At all relevant times, Star Pipe has imported, marketed and sold DIPF throughout the United States.

### AGENTS AND CO-CONSPIRATORS

16.     The acts alleged to have been done by any Defendant were authorized, ordered, or done by its officers, directors, managers, agents, employees, or representatives while actively engaged in the management, direction or control of that Defendant's businesses or affairs.

4

17.     Various persons and firms not named as Defendants in this Complaint have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

18.     Each Defendant acted as the principal or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## FACTUAL ALLEGATIONS

### Defendants' Price-Fixing Conspiracy in the DIPF Market

19.     Beginning at least as early as January 2008, Defendants conspired to fix, raise, maintain and stabilize the prices at which DIPF were sold in the United States.

20.     In January 2008, both imported and domestic DIPF were commercially available in the United States.  Each of the Defendants sold imported DIPF, but only McWane produced DIPF in the United States.

21.     All Defendants desired price increases in 2008.  However, McWane was concerned that Sigma and Star Pipe would not adhere to announced price increases, which would result in lost sales for McWane.

22.     In January 2008, McWane, Sigma and Star Pipe agreed to support higher prices, and Sigma and Star Pipe agreed to reduce the risk that their local sales personnel would take steps to limit their discounting of DIPF from published price levels.

23.     Pursuant to their agreement, on January 11, 2008, McWane publicly announced the first DIPF price increase of 2008, and then Sigma and Star Pipe announced price increases.

24.     On or about March 10, 2008, McWane and Sigma executives by telephone discussed their implementation of the January 2008 price increase.

25.    In June 2008, McWane, Sigma and Star Pipe agreed to support higher prices and document and exchange the volume of their monthly sales of DIPF under the auspices of the Ductile Iron Fittings Research Association ("DIFRA").

26.    Pursuant to their agreement, on June 17, 2008, McWane publicly announced the second DIPF price increase of 2008, and then Sigma and Star Pipe announced their price increases.

27.    On or about August 22, 2008, executives of McWane and Sigma by telephone discussed their efforts to implement the June 2008 price increase.

28.    Independent wholesale distributors, known as "waterworks distributors," are the primary channel of distribution of DIPF to end users.

29.    McWane communicated the terms of its agreement with Sigma and Star Pipe to document and exchange the volume of their monthly sales of DIPF through DIFRA through a letter sent by McWane to waterworks distributors.  A section of that letter was meaningless to distributors but was intended to inform Sigma and Star Pipe of the terms of McWane's offer.

30.    Sigma and Star Pipe manifested their understanding and acceptance of McWane's offer by initiating their participation in the DIFRA information exchange.

31.    Under the DIFRA information exchange, Defendants each submitted a report of their previous month's sales to an accounting firm.  Shipments were reported in tons shipped, subdivided by diameter size range and by joint type.  Data submissions were aggregated and distributed back to the Defendants.  Data submitted to the accounting firm was typically no older than 45 days, and the summary reports returned to the Defendants contained data typically no more than two months old.

32.     Between June 2008 and January 2009, the DIFRA information exchange enabled each of the Defendants to determine and monitor its own market share and, indirectly, the sales levels of the other two Defendants to monitor compliance with their agreements.

### McWane Monopolized and Conspired with Sigma to Monopolize the Domestic DIPF Market

33.     The enactment of ARRA in February 2009 gave Sigma and Star Pipe an incentive to enter the domestic DIPF market.

### McWane Eliminated Sigma as a Potential Entrant into the Domestic DIPF Market

34.     Sigma took steps to enter into the domestic DIPF market including:

  i.      formulating an operational plan;

  ii.     arranging for an infusion of equity capital to fund United States production;

  iii.    obtaining approval of its board of directors for its entry plans; and

  iv.     casting prototype product.

35.     McWane became aware that Sigma was preparing to enter the domestic DIPF market and sought to avoid competition from Sigma by inducing Sigma to become a distributor of McWane's domestic DIPF.

36.     McWane and Sigma reached agreement to foreclose Sigma from entering the domestic DIPF market through a Master Distribution Agreement dated September 17, 2009 ("MDA"). The principal terms of the MDA were:

  a.      McWane would sell United States produced DIPF to Sigma at a 20 percent discount off of McWane's published prices;

  b.      McWane would be Sigma's exclusive source for the relevant domestic DIPF;

c.  Sigma would resell McWane's domestic DIPF at or very near McWane's published prices for domestic DIPF; and

d.  Sigma would resell McWane's domestic DIPF to waterworks distributors only on the condition that the distributor agreed to purchase domestic DIPF exclusively from McWane or Sigma.

37.  McWane and Sigma also agreed, although it was not written in the MDA, that McWane would sell its domestic DIPF at or very near its published prices.

38.  Under the MDA, McWane controlled the prices at which Sigma could sell domestic DIPF and the customers to whom Sigma could sell domestic DIPF.

39.  In the absence of the MDA, Sigma would have entered the domestic DIPF market in competition with McWane.

40.  Sigma's participation in the domestic DIPF market under the MDA was not equivalent to, and for consumers not a substitute for, Sigma's competitive entry into the domestic DIPF market.

41.  Sigma's independent, competitive entry into the domestic DIPF market would likely have benefitted consumers by increasing competition and domestic DIPF supply, thereby constraining McWane's prices for domestic DIPF.

42.  Through the MDA, McWane transferred a share of its sales and profits in the domestic DIPF market to Sigma in exchange for Sigma's commitment to abandon its plans to enter the domestic DIPF market as an independent competitor.

43.  Both McWane and Sigma entered into the MDA with the specific intent to maintain artificially inflated prices in the domestic DIPF market by eliminating competition among themselves and excluding their rivals.

## McWane Enforced Exclusive Distribution Policies

44.     In June 2009, Star Pipe announced its entry into the domestic DIPF market.

45.     McWane responded to Star Pipe's entry by adopting restrictive and exclusive distribution policies to impede and delay Star Pipe's and others' entry into the domestic DIPF market.

      a.     McWane threatened waterworks distributors with delayed or diminished access to McWane's domestic DIPF and the loss of accrued rebates on the purchase of McWane's domestic DIPF, if those distributors purchased domestic DIPF from Star Pipe or others.

      b.     McWane threatened some waterworks distributors with the loss of rebates in other product categories, including ductile iron pipe, waterworks valves and hydrants, if those distributors purchased domestic DIPF from Star Pipe or others.

      c.     Beginning in 2011, McWane modified its rebate structure for domestic DIPF to require waterworks distributors to make certain high minimum shares of their total domestic DIPF purchases from McWane to qualify for rebates.

46.     The purpose and effect of McWane's exclusive dealing policies, joined by Sigma, has been to compel the majority of waterworks distributors to deal with McWane and Sigma on an exclusive or nearly exclusive basis for their domestic DIPF business.

47.     The exclusive distribution policies have foreclosed Star Pipe and others from a substantial volume of sales opportunities with waterworks distributors, reducing the supply of domestic DIPF and resulting in higher domestic DIPF prices.

48.     As a result of the constraints on competition effected by the exclusive distribution policies, prices of domestic DIPF have remained artificially inflated.

49.     The exclusive distribution policies have raised barriers to entry into the domestic DIPF market by other potential entrants, limited competition in the market, and further reduced domestic DIPF supply, resulting in increased prices of domestic DIPF.

### Federal Trade Commission Complaints and Sigma Consent Agreement

50.     Defendants' conspiracy was revealed on January 4, 2012, when the United States Federal Trade Commission ("FTC"), following an investigation, filed complaints against the Defendants concerning their anti-competitive conduct. The FTC complaints document Defendants' illegal inflation of DIPF prices beginning in January 2008.

51.     Defendant Sigma has entered into a Consent Agreement with the FTC concerning the allegations set forth in the FTC complaints.  Pursuant to the Consent Agreement, Sigma has agreed to refrain from participating in or maintaining any combination or conspiracy between any competitors to fix, raise or stabilize the prices at which DIPF are sold in the United States or to allocate or divide markets, customers, or business opportunities.

### PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY

52.     Defendants' anti-competitive activities have had the following effects, among others:

        a.     Price competition has been restrained or eliminated with respect to DIPF;

        b.     The prices of DIPF have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

        c.     direct purchasers of DIPF have been deprived of free and open competition.

53.     During the Class Periods, Plaintiff and the members of the Classes have paid supra-competitive prices for DIPF.

54.     By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for DIPF than they would have paid in the absence of Defendants' illegal activities and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## INTERSTATE TRADE AND COMMERCE

55.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of, interstate trade and commerce of the United States, in that, among other things:

      a.    Defendants and their co-conspirators have sold DIPF throughout the United States;

      b.    Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell DIPF throughout the United States;

      c.    In furtherance of the conspiracy alleged here, Defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

      d.    The conspiracy alleged herein has affected millions of dollars of commerce.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action on behalf of itself and, under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, as a representative of the following classes:

Early Class

All persons and entities that purchased DIPF directly from any of the
Defendants between January 2008 and January 2009 (the " DIPF Class
Period"). Excluded from the Class are Defendants and their officers,
employees, agents, representatives, parents, subsidiaries and affiliates.

Late Class

All persons and entities that purchased domestic DIPF directly from
McWane or Sigma from February 2009 to the present (the "Domestic
DIPF Class Period"). Excluded from the Class are McWane, Sigma and
their officers, employees, agents, representatives, parents, subsidiaries
and affiliates.

57.    Due to the nature of the trade and commerce involved, there are thousands of

Class members geographically dispersed across the United States such that joinder is

impracticable.

58.    Class members are identifiable from information and records in Defendants'

possession.

59.    There are questions of law and fact common to the Classes.  The questions

include, but are not limited to:

a.    Whether Defendants engaged in a contract, combination or conspiracy to

fix, raise, maintain, or stabilize the price charged for DIPF sold in the

United States;

b.    Whether Defendant McWane intentionally monopolized the

domestic DIPF market through exclusionary practices;

c.    Whether defendants McWane and Sigma intentionally conspired to

monopolize the domestic DIPF market;

    d.    The duration of the anti-competitive activities alleged in this Complaint, and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

    e.    Whether Defendants' conspiracy violated the Sherman Act § 1;

    f.    Whether Defendants McWane and Sigma violated Sherman Act § 2;

    g.    Whether Defendants McWane and Sigma conspired to violate Sherman Act § 1;

    h.    Whether the conduct of Defendants caused injury to the business and property of Plaintiff and other members of the Classes;

    i.    The effect of Defendants' anti-competitive activities on the prices of DIPF sold by Defendants during the Class Periods; and

    j.    The appropriate measure of damages sustained by Plaintiff and other members of the Classes.

60.    Plaintiff's claims are typical of the claims of other members of the Classes arising out of Defendants' common course of conduct in violation of the law.

61.    Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff has retained competent counsel experienced in the prosecution of antitrust class action litigation.

62.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

63.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members.

64.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by members of the Classes that otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## VIOLATIONS ALLEGED

### FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### Price Fixing in Restraint of Trade
### (Against All Defendants on Behalf of the Early Class)

65.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 3, 7 though 32, and 50 through 64, as if fully set forth herein.

66.    There were several features of the DIPF industry that facilitated collusion among Defendants.

67.    DIPF are products produced to industry-wide standards, which enhanced Defendants' ability to collude on prices and to detect deviations from those collusive prices.

68.    Defendants published nearly identical price books listing per-unit prices for each DIPF item carried by a given supplier and periodically published uniform multiplier discounts at which they offered to sell DIPF.  By simplifying and standardizing published

14

prices, the DIPF price list/multiplier format enhanced the Defendants' ability to collude on prices and to detect deviations from those collusive prices.

69.     The DIPF industry has been highly concentrated.  In 2008, Defendants collectively made more than 90 percent of sales of DIPF in the United States.  A highly concentrated market enhanced Defendants' ability and incentive to collude on prices.

70.     The DIPF industry is subject to significant barriers to entry, including the need for a new entrant to develop a distribution network and a reputation for quality and service with waterworks distributors and end users.  Convincing end users to allow the use of a new entrant's DIPF is often a time-consuming process.

71.     Demand for DIPF is inelastic to changes in price.  DIPF are a relatively small portion of the cost of materials of a typical waterworks project, and there are no widely used substitutes for the product.

72.     Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to artificially fix, raise, stabilize and control prices for DIPF sold in the United States.

73.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other members of the Early Class who purchased DIPF have been harmed because they were forced to pay inflated, supra-competitive prices for DIPF.

74.     Defendants' contract, combination, and conspiracy in restraint of trade had the following effects, among others:

      a.             Prices for DIPF sold by Defendants have been fixed, raised, maintained and/or stabilized at artificially high, supra-competitive levels throughout the United States; and

      b.             Plaintiff and members of the Early Class who purchased DIPF from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

75.     Plaintiff and members of the Early Class are entitled to treble damages to remedy the injuries they have suffered from Defendants' violations of Sherman Act § 1, 15 U.S.C. § 1.

**SECOND CLAIM FOR RELIEF**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Monopolization**
**(Against McWane on Behalf of the Late Class)**

76.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 64 as if fully set forth herein.

77.     The relevant product market is the sale of DIPF manufactured in the United States ("Domestic DIPF").

78.     The relevant geographic market is the United States.

79.     Since February 2009, there have been no close substitutes for Domestic DIPF, and no other products significantly constrain the pricing for Domestic DIPF.

80.     McWane's monopoly power in the Domestic DIPF market is protected by substantial barriers to entry and expansion.

81.     For suppliers of DIPF that have existing relationships and goodwill with waterworks distributors and established reputations for quality and service in the provision of DIPF, McWane's unfair and exclusionary methods of competition are the primary barriers to effective entry and expansion in the Domestic DIPF market.

16

82.     McWane's monopoly power in the Domestic DIPF market has been

demonstrated by its ability to exclude competitors, to control prices, and to coercively impose

unwanted distribution policies on its customers.

83.     McWane has intentionally and willfully maintained and unlawfully exercised

monopoly power to maintain and expand its monopoly in the Domestic DIPF market through the

exclusionary, anti-competitive conduct set forth above, including, but not limited to: (1)

conspiring with and eliminating Sigma as a potential entrant through exclusionary tactics; (2)

entering into an MDA with Sigma with the specific intent to monopolize the Domestic DIPF

market; (3) foreclosing Star Pipe and others from entering into the Domestic DIPF market by

threatening waterworks distributors with delayed or diminished access to McWane's

Domestic DIPF and the loss of accrued rebates on the purchase of McWane's Domestic

DIPF, if those distributors purchased Domestic DIPF from Star Pipe or others; (4) threatening

waterworks distributors with the loss of rebates in other product categories, including ductile

iron pipe, waterworks valves and hydrants, if those distributors purchased Domestic DIPF

from Star Pipe or others; and (5) modifying its rebate structure for Domestic DIPF to require

waterworks distributors to make certain high minimum shares of their total Domestic DIPF

purchases from McWane to qualify for these rebates.

84.     McWane has effectively excluded competition from a significant portion of the

Domestic DIPF market, unlawfully maintained and expanded its monopoly in the Domestic DIPF

market, and profited from its anti-competitive conduct by maintaining prices at artificially high

levels.

85.     There is no legitimate business justification for McWane's anticompetitive

actions and the conduct through which it maintained its monopoly in the Domestic DIPF market.

The anti-competitive effects of McWane's conduct far outweigh any conceivable pro-competitive benefit or justification. Even if such justification had existed, any possible pro-competitive benefits could have been obtained by less restrictive alternatives.

86.     As a direct and proximate result of McWane's anti-competitive conduct, Plaintiff and members of the Late Class have been and continue to be injured in their business or property.

87.     As a direct and proximate result of McWane's unlawful actions, Plaintiff and the other members of the Late Class have been forced to pay artificially high, supra-competitive prices for Domestic DIPF and were harmed thereby.

88.     Plaintiff and members of the Late Class are entitled to treble damages to remedy the injuries they have suffered from McWane's violations of Sherman Act § 2, 15 U.S.C. § 2.

**THIRD CLAIM FOR RELIEF**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Conspiracy to Monopolize**
**(Against McWane and Sigma on Behalf of the Late Class)**

89.     Plaintiff incorporates by reference the allegations in the paragraphs 1 through 64 and 77 through 79 as if fully set forth herein.

90.     McWane and Sigma have conspired to allow McWane to willfully maintain and unlawfully exercise monopoly power in the Domestic DIPF market through the exclusionary, anti-competitive conduct set forth above, including, but not limited to: (1) conspiring with and eliminating Sigma as a potential market entrant through exclusionary tactics; (2) entering into an MDA with Sigma with the specific intent to monopolize the Domestic DIPF market; and (3) foreclosing Star Pipe and others from effectively competing in the Domestic DIPF market through exclusive dealing contracts and other coercive business practices.

91.     As a result of the conspiracy, McWane and Sigma have effectively excluded competition from a significant portion of the Domestic DIPF market, unlawfully maintained and expanded McWane's dominant market share in the Domestic DIPF market, and profited from their anti-competitive conduct by maintaining prices at artificially high levels.

92.     There is no legitimate business justification for the anti-competitive actions of McWane and Sigma and the conduct through which McWane maintained its monopoly in the Domestic DIPF market. The anti-competitive effects of McWane's and Sigma's conduct far outweigh any conceivable pro-competitive benefit or justification.

93.     As a direct and proximate result of the anti-competitive conduct of McWane and Sigma, Plaintiff and members of the Late Class have been and continue to be injured in their business or property.

94.     As a direct and proximate result of McWane's and Sigma's unlawful actions, Plaintiff and the other members of the Late Class have been forced to pay artificially high, supra-competitive prices for Domestic DIPF and were harmed thereby.

95.     Plaintiff and members of the Late Class are entitled to treble damages to remedy the injuries they have suffered from McWane's and Sigma's violations of Sherman Act § 2, 15 U.S.C. § 2.

### FOURTH CLAIM FOR RELIEF
#### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
#### Conspiracy in Restraint of Trade
#### (Against McWane and Sigma on Behalf of the Late Class)

96.     Plaintiff incorporates by reference the allegations in the paragraphs 1 through 64 and 77 through 79 as if fully set forth herein.

97.     McWane and Sigma have conspired to allow McWane to willfully and unlawfully maintain and exercise monopoly power in the Domestic DIPF market through the

19

exclusionary, anti-competitive conduct set forth above, including, but not limited to: (1) conspiring with and eliminating Sigma as a potential market entrant through exclusionary tactics; (2) entering into an MDA with Sigma with the specific intent to monopolize the Domestic DIPF market; and (3) collectively foreclosing Star Pipe and others from effectively competing in the Domestic DIPF market through exclusive dealing contracts and other coercive business practices.

98.     As a result of the conspiracy, McWane and Sigma have effectively excluded competition from a significant portion of the Domestic DIPF market, unlawfully maintained and expanded McWane's dominant market share in the Domestic DIPF market, and profited from their anti-competitive conduct by maintaining prices at artificially high levels.

99.     There is no legitimate business justification for the anti-competitive actions of McWane and Sigma and the conduct through which McWane maintained its monopoly in the Domestic DIPF market. The anti-competitive effects of McWane's and Sigma's conduct far outweigh any conceivable pro-competitive benefit or justification.

100.     As a direct and proximate result of the anti-competitive conduct of McWane and Sigma, Plaintiff and members of the Late Class have been and continue to be injured in their business or property.

101.     As a direct and proximate result of McWane's and Sigma's unlawful actions, Plaintiff and the other members of the Late Class have been forced to pay artificially high, supra-competitive prices for Domestic DIPF and were harmed thereby.

102.     Plaintiff and members of the Late Class are entitled to treble damages to remedy the injuries they have suffered from McWane's and Sigma's violations of Sherman Act § 1, 15 U.S.C. § 1.

## PRAYER FOR RELIEF

Accordingly, Plaintiff and the Classes respectfully request the following relief:

(a)     Certification of the Classes defined in this Complaint pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), and designation of Plaintiff as the representative for the Classes and its counsel as Class Counsel for the Classes;

(b)     The actions of Defendants described herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c)     The actions of Defendants McWane and Sigma described herein be adjudged and decreed to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(d)     The Court permanently enjoin McWane and Sigma and any of their parents, subsidiaries, or affiliates from engaging in the conduct described herein;

(e)     Plaintiff and the Classes recover damages, trebled, as provided by law, that they are determined to have sustained, and judgment in favor of Plaintiff and the Classes be entered against Defendants, together with prejudgment interest at the maximum rate allowable by law;

(f)     Plaintiff and the Classes recover the costs of this suit, including reasonable attorneys' fees, as provided by law; and

(g)     Plaintiff and the Classes be granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

## JURY DEMAND

Plaintiff demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure of all issues so triable.

Dated: February 13, 2012

**LITE DEPALMA GREENBERG, LLC**

/s/ Allyn Z. Lite
Allyn Z. Lite
Mayra V. Tarantino
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
alite@litedepalma.com
mtarantino@litedepalma.com

**LITE DEPALMA GREENBERG, LLC**
Steven J. Greenfogel
1521 Locust Street
8th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 268-7641
sgreenfogel@litedeplma.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
rkaplan@kaplanfox.com
rkilsheimer@kaplanfox.com
garenson@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
William J. Pinilis
160 Morris Street
Morristown, NJ 07960
Tel: 973.656.0222
Fax: 973.401.1114
**wpinilis@kaplanfox.com**

**KAPLAN FOX & KILSHEIMER LLP**
Gary L. Specks
423 Sumac Road
Highland Park, IL 60035
Tel: (847) 831-1585

**JAMES B. SLOAN LTD.**
James B. Sloan
One Westminster Place
Lake Forest, IL 60045
Tel: (847) 234-6300

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by its attorneys, hereby certifies that to the best of its knowledge, the matter in controversy is related to the following matters:

- *Yates Construction Co., Inc. v. Sigma Corporation, et al.*, Civil Action No. 12-169 (AET)(LHG);

- *John Hoadley and Sons, Inc. v. McWane, Inc., et al.*, Civil Action No. 12-711 (AET)(LHG);

- *Thompson Distribution v. Sigma Corporation, et al.*, Civil Action No. 12-717 (PGS)(LHG);

- *South Huntington Water District v. Sigma Corporation, et al.*, Civil Action No. 12-734 (FLW)(DEA); and

- *Water Line Supply, LLC. v. Sigma Corporation, et al.*, Civil Action No. 12-788 (AET)(LHG).

Plaintiff is not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.


Dated: February 13, 2012          **LITE DEPALMA GREENBERG, LLC**


                    By:     /s/ *Allyn Z. Lite*
                            Allyn Z. Lite
                            Two Gateway Center, Suite 1201
                            Newark, New Jersey 07102
                            Tel: (973) 623-3000
                            Fax: (973) 623-0858
                            alite@litedepalma.com